IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL COLBERT, as Brother and | ) | CASE NO.: 1:21-cv-01161 |
| Administrator of the Estate of Decedent | ) | |
| NICHOLAS MICHAEL COLBERT, | ) | JUDGE: DONALD C. NUGENT |
| ℅ The Law Office of Paul J. Cristallo | ) | |
| 4403 ST. CLAIR AVENUE | ) | **FIRST AMENDED COMPLAINT** |
| CLEVELAND, OH  44103 | ) | |
| | ) | **(Jury Demand Endorsed Hereon** |
| Plaintiff | ) | **Along With Motion to Extend** |
| | ) | **Time In Which To File Affidavit** |
| -vs- | ) | **Of Merit Pursuant to Ohio Civil** |
| | ) | **Rule 10(D)(2)(b))** |
| | ) | |
| CUYAHOGA COUNTY | ) | |
| 2079 East Ninth Street | ) | |
| Cleveland, Ohio  44115 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ARMOND BUDISH | ) | |
| EARL LEIKEN | ) | |
| KENNETH MILLS (official capacity only) | ) | |
| ERIC J. IVEY | ) | |
| DR. THOMAS TALLMAN | ) | |
| BARRINGTON BROWN | ) | |
| JAMES LEE JOHNSON | ) | |
| ROBERT HEAD | ) | |
| ANDRE AVERYHEART | ) | |
| ANTONIO BRUNELLO | ) | |
| CHANDA ZITIELLO | ) | |
| LESLIE CHUTE | ) | |
| (in their individual and official capacities) | ) | |
| ℅ CUYAHOGA LAW DEPARTMENT | ) | |
| 2079 E. 9TH STREET | ) | |
| CLEVELAND, OHIO, 44115 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE METROHEALTH SYSTEM | ) | |
| 2500 Metrohealth Drive | ) | |
| Cleveland, Ohio  44109 | ) | |

)
and )
)
)
SHJB3, CORRECTIONS OFFICER/ )
INTAKE/SCREENING )
(in their individual and official capacity) )
% CUYAHOGA LAW DEPARTMENT )
2079 E. 9TH ST. )
CLEVELAND, OH 44115 )
)
and )
)
JOHN DOE INTAKE/SCREENING )
NURSE/OFFICER )
(in their individual and official capacity) )
% CUYAHOGA LAW DEPARTMENT )
2079 E. 9TH ST. )
CLEVELAND, OH 44115 )
)
and )
)
JOHN DOE CHARGE NURSE )
(in their individual and official capacity) )
% CUYAHOGA LAW DEPARTMENT )
2079 E. 9TH ST. )
CLEVELAND, OH 44115 )
)
and )
)
JOHN DOE FLOOR SUPERVISOR )
(in their individual and official capacity )
% CUYAHOGA LAW DEPARTMENT )
2079 E. 9TH ST. )
CLEVELAND, OH 44115 )
)
and )
)
JOHN DOE NURSES (1-10) )
(in their individual and official capacity) )
% CUYAHOGA LAW DEPARTMENT )
2079 E. 9TH ST. )
CLEVELAND, OH 44115 )
)

| and | ) |
| | ) |
| JOHN DOES CUYAHOGA COUNTY | ) |
| (1-10) | ) |
| (in their individual and official capacity) | ) |
| ℅ CUYAHOGA LAW DEPARTMENT | ) |
| 2079 E. 9TH ST. | ) |
| CLEVELAND, OH 44115 | ) |
| | ) |
| Defendants | ) |

## INTRODUCTION

1.     This civil rights action arises out of the preventable and tragic death of Nicholas Michael Colbert, a 36-year-old honorably discharged veteran and father to four young daughters.   Nicholas Colbert became addicted to pain medication after fracturing his collarbone and thereafter suffered from mental health issues, substance abuse withdrawal, and was a known risk for self-harm.   Cuyahoga County was made aware of all of these health conditions.   As a direct and proximate result of the acts and omissions as set forth herein, Nicholas Michael Colbert suffered emotional distress, severe physical pain and suffering, and death. Plaintiff Daniel Colbert, Nicholas' brother and the Administrator of Nicholas Colbert's Estate, seeks compensatory and punitive damages as well as reasonable attorneys' fees and the costs associated with this action.

## JURISDICTION AND VENUE

2.     The Jurisdiction of the Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983 *et seq*; 42 U.S.C. § 12101 (the "Americans with Disabilities Act"); the Judicial Code, §§ 1331 and 1343(a); §504 of the Rehabilitation Act of 1973 (§504); and the Constitution of the United States.

3.      Venue in this Court is proper as the parties reside, or at the time the events took place, resided in Cuyahoga County, and the events giving rise to the Plaintiff's claims also occurred in Cuyahoga County.

**PARTIES**

4.      Plaintiff Daniel Colbert is, and was at all times relevant, a resident of the State of Ohio and Summit County.   Daniel Colbert is the duly appointed Administrator of the Estate of Nicholas Michael Colbert.

5.      Decedent Nicholas Michael Colbert ("Decedent") was at all times relevant to this Complaint a pretrial detainee in the custody and care of the Cuyahoga County Correctional Center/Jail ("CCCC").   At all times relevant to the allegations made in this Complaint, Decedent resided in the City of Cleveland, Cuyahoga County, Ohio.

6.      Defendant Cuyahoga County and/or the Cuyahoga County Board of Commissioners (collectively referred to hereinafter as "Defendant Cuyahoga County") is, and was at all times relevant, a political subdivision and unit of local government duly organized under the laws of the State of Ohio.   Cuyahoga County operates and is responsible for the Cuyahoga County Correctional Center ("CCCC"), also known and referred to as the Cuyahoga County Jail, a correctional facility owned and operated by Cuyahoga County, with its principal place of business located at 1215 W. 3rd Street, Cleveland, Ohio, 44113. Defendant Cuyahoga County is a political subdivision/entity and is a "person"

subject to being sued pursuant to 42 U.S.C. §1983. Defendant Cuyahoga County is or was the employer and/or principal of the other named defendants.

7. Defendant Budish is the Cuyahoga County Executive. Defendant Budish is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Budish was responsible for the CCCC's operation, acted within the course and scope of his employment, and acted under the color of law. Defendant Budish was responsible for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant Budish had policy making and/or final policy making authority for the CCCC and is sued in his individual and official capacity.

8. Defendant Leiken was the County Executive's chief of staff. Defendant Leiken is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Leiken was also responsible for the CCCC's operation, acted within the scope of his employment, and acted under the color of law. Defendant Leiken was also responsible for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant Leiken had policy making and/or final policy making authority for the CCCC and is sued in his individual and official capacity.

9. Defendant Mills was the Director of the CCCC. Defendant Mills is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Mills was also responsible for the CCCC's operation, acted within the scope of his employment, and acted under the color of law. Defendant Mills was also

responsible for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant Mills had policy making and/or final policy making authority for the CCCC and is sued in his official capacity.

10.     Defendant Ivey was the Warden of the CCCC.   Defendant Ivey is a "person" under 42 U.S.C. § 1983.  At all times relevant to this case, Defendant Ivey was also responsible for the CCCC's operation, acted within the scope of his employment, and acted under the color of law.   Defendant Ivey was also responsible for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant Ivey had policy making and/or final policy making authority for the CCCC and is sued in his individual and official capacity.

11.     Defendant Dr. Thomas Tallman was the Director of Correctional Medicine and/or the CCCC's Medical Director.  Defendant Dr. Tallman is a "person" under 42 U.S.C. § 1983.  At all times relevant to this case, Defendant Dr. Tallman was also responsible for the CCCC's operation, acted within the scope of his employment, and acted under the color of law.  Defendant Dr. Tallman was also responsible for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant Dr. Tallman had policy making and/or final policy making authority for the CCCC and is sued in his individual and official capacity.

12.     Defendant MetroHealth System ("Defendant MetroHealth") was and is a political subdivision and unit of local government duly organized under the laws of the State of Ohio, and/or is a non-profit public health care system located in Cleveland, Ohio, and is a "person" under 42 U.S.C. § 1983. Defendant Cuyahoga County contracts with MetroHealth to oversee and provide medical, nursing, and mental health services at the CCCC. Defendant MetroHealth operated at all times relevant herein under the color of law and was responsible for the policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC. Defendant MetroHealth, by and through its officers, employees and agents, had policy making and/or final policy making authority for the CCCC.

13.     Defendant Barrington Brown was at all times relevant herein a Corrections Officer at the CCCC. Defendant Brown is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Brown acted within the scope of his employment, and acted under the color of law. Defendant Brown is sued in his individual and official capacity.

14.     Defendant James Lee Johnson was at all times relevant herein a Corrections Officer at the CCCC. Defendant Johnson is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Johnson acted within the scope of his employment, and acted under the color of law. Defendant Johnson is sued in his individual and official capacity.

15.     Defendant Robert Head was at all times relevant herein a Corrections Officer at the CCCC.  Defendant Head is a "person" under 42 U.S.C. § 1983.  At all times relevant to this case, Defendant Head acted within the scope of his employment, and acted under the color of law.  Defendant Head is sued in his individual and official capacity.

16.     Defendant Andre Averyheart was at all times relevant herein a Corrections Officer at the CCCC.  Defendant Averyheart is a "person" under 42 U.S.C. § 1983.  At all times relevant to this case, Defendant Averyheart acted within the scope of his employment, and acted under the color of law.  Defendant Averyheart is sued in his individual and official capacity.

17.     Defendant Antonio Brunello was at all times relevant herein a corporal at the CCCC.  Defendant Brunello is a "person" under 42 U.S.C. § 1983.  At all times relevant to this case, Defendant Brunello was also responsible for the CCCC's operation, acted within the scope of his employment, and acted under the color of law.  Defendant Brunello bore some responsibility for CCCC's policies, procedures, practices, customs as well as the training and supervision of agents, servants, and employees of the CCCC.  Defendant Brunello had some policy making and/or final policy making authority for the CCCC and is sued in his individual and official capacity.

18.     Defendant Chanda Zitello was a nurse or other health care provider at the CCCC.  Defendant Zitello is a "person" under 42 U.S.C. § 1983.  At all times relevant to this case, Defendant Zitello acted within the scope of her employment

and acted under the color of law. Defendant Zitello is sued in her individual and official capacity.

19. Defendant Leslie Chute was a nurse or other health care provider at the CCCC. Defendant Chute is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant Chute acted within the scope of her employment and acted under the color of law. Defendant Chute is sued in her individual and official capacity.

20. Defendant Cuyahoga County Corrections Officer SHJB3, name unknown and Plaintiff could not discovery the name, however and for identification purposes, was the on-duty Pre-Booking Corrections Officer for Nicholas Colbert on May 8, 2019 at or around 3:38 p.m., in or near the sallyport of the CCCC, conducted the pre-booking of Nicholas Colbert prior to C.O. James Lee Johnson booking Mr. Colbert, and whose initials appear as "SHJB3" on Nicholas Colbert's intake/booking page, who may or may not be Defendant Leslie Chute. SHJB3 is a "person" under 42 U.S.C. § 1983. At all times relevant to this case, Defendant SHJB3 acted within the scope of their employment, and acted under the color of law. Defendant SHJB3 is sued in their individual and official capacity.

21. Defendant John Doe Intake Screening Nurse/Officer name unknown and unable to be discovered by Plaintiff, however and for identification purposes was the on-duty intake screening nurse or officer for Nicholas Colbert on May 8, 2019

in the CCCC[1].  This John Doe Intake Screening Nurse/Officer was on duty and conducted the medical screening of Nicholas Colbert.  John Doe Intake Screening Nurse/Officer is a "person" under 42 U.S.C. § 1983.  At all times relevant to this case, Defendant John Doe Intake Screening Nurse/Officer acted within the scope of their employment, and acted under the color of law.   Defendant John Doe Intake Screening Nurse/Officer is sued in their individual and official capacity.

22.     Defendant John Doe Nurse Manager name unknown and unable to be discovered by Plaintiff, however and for identification purposes was the on-duty Nurse Manager at the CCCC on May 8, 2019 (see Fn.1) at the CCCC.  This Nurse Manager was on duty when Nicholas Colbert was brought up from the sally-port/ bullpen to the 4th floor of the jail.  John Doe Nurse Manager is a "person" under 42 U.S.C. § 1983.  At all times relevant to this case, Defendant John Doe Nurse Manager acted within the scope of their employment, and acted under the color of law.  Defendant John Doe Nurse Manager is sued in their individual and official capacity.

23.     Defendant John Doe Charge Nurse name unknown and unable to be discovered by Plaintiff, however and for identification purposes was the on-duty Charge Nurse at the CCCC on May 8, 2019 (see Fn.1) at the CCCC.  This Nurse Manager was on duty when Nicholas Colbert was brought up from the sally-port/

_____

[1] Some of Defendant Cuyahoga County's records regarding Nicholas Colbert's death indicate he was booked into the jail on May 8, while others indicate he was booked into the jail on May 9.  As such, the Nurse or Officer who conducted Nicholas Colbert's health screening should be identified by the screening form and their role as having performed Mr. Colbert's screening as opposed to the day they performed it.

bullpen to the 4th floor of the jail.  John Doe Charge Nurse is a "person" under 42 U.S.C. § 1983.  At all times relevant to this case, Defendant John Doe Charge Nurse acted within the scope of their employment, and acted under the color of law.  Defendant John Doe Charge Nurse is sued in their individual and official capacity.

24.     Defendants John Doe Nurses 1-10 names unknown and unable to be discovered by Plaintiff, however and for identification purposes were the on-duty nurses Manager at the CCCC from May 8, 2019 (see Fn.1) and at the time Nicholas Colbert was booked into the CCCC from the time he was taken to the Veterans' Pod in Jail 1 on May 10, 2019 at approximately 11:00 am..  John Doe Nurses 1-10 are "persons" under 42 U.S.C. § 1983.  At all times relevant to this case, Defendants John Doe Nurses acted within the scope of their employment, and acted under the color of law.  Defendant John Doe Nurses are sued in their individual and official capacity.

25.     John Doe Officers 1-10 are those individuals and entities whom, at all times relevant herein were employees, agents or acting on behalf of Defendant Cuyahoga County and/or Defendant MetroHealth or were acting under the supervision, agency and/or authority of Defendant Cuyahoga County and/or Defendant MetroHealth.  These Defendants are each a "person" under 42 U.S.C. § 1983.  At all times relevant to this case, these Defendants acted within the scope of their employment and acted under the color of law.  These Defendants are each sued in their individual and official capacity.

## **FACTS**

26.　　On May 8, 2019, National Guard veteran and father of four Nicholas Michael Colbert was booked into the Cuyahoga County Corrections Center (CCCC) for a non-violent offense.

27.　　According to Cuyahoga County records, Nicholas Colbert was initially booked into the CCCC by Maple Heights Police Officers, Officers John Hantak and/or Derek Jividen and another Maple Heights Officer, identified herein as John Doe Maple Heights Officer. Neither of these Officers should have been permitted to book Nicholas Colbert or any other inmates into the CCCC. Nicholas Colbert presented with obvious symptoms of drug abuse, drug withdrawal, and/or other mental and physical symptoms which should have alerted these intake personnel to the fact that Nicholas Colbert was in need of immediate medical and/or mental health counseling. The defendants failed to perform an adequate medical screening on Nicholas Colbert and they failed to ensure that other intake officers or medical staff performed an adequate medical screening. According to separate Cuyahoga County records, Nicholas Colbert was booked into the CCCC by Defendant Corrections Officer James Lee Johnson (identified as SHJLJ on Nicholas Colbert's booking page). Defendant Johnson purportedly performed an intake and screening of Nicholas Colbert. A second Corrections Officer performed Nicholas Colbert's pre-booking intake and screening and is identified in the Cuyahoga County records as SHJB3, and/or Leslie Chute　(Defendant

C.O.'s SHJB3's name, badge and identification number are not reflected in the documents provided by Cuyahoga County. However, the records available reflect that Nurse Leslie Chute may be SHJB3 or performed a cursory intake of Nicholas Colbert along with SHJB3). Nicholas Colbert presented with obvious symptoms of drug abuse, drug withdrawal, and/or other mental and physical symptoms which should have alerted these defendants to the fact that Nicholas Colbert was in need of immediate medical and/or mental health counseling. These defendants failed to perform an adequate medical screening on Nicholas Colbert and they failed to ensure that other intake officers or medical staff performed an adequate medical screening. Furtermore, and despite being expressly made aware, these defendants also failed to inform jail staff and/or medical personnel that Nicholas Colbert had a prior suicide attempt approximately five (5) weeks prior to being booked into the CCCC. In addition to other failures, these defendants also failed to ensure that Nicholas Colbert was taken to a medical floor or pod within the CCCC for an assessment and/or treatment. Defendant Nurse Chute noted that Mr. Colbert was in the midst of withdrawing from multiple substances at the time of his evaluation, yet no follow-up treatment was requested and none given. Mr. Colbert was forced to suffer the devastating effects of drug withdrawal without any medical care or attention. It is well documented within the medical community that drug withdrawal is a serious medical condition and that it can lead to mental health crisis, despondency, thoughts of self-harm, and suicide.

Despite the objectively serious medical emergency, which was expressly known to the Defendants, Mr. Colbert's medical needs were ignored.

28.     Nicholas Colbert was eventually asked a series of questions for a "Pre-Screening Questionnaire".    This questionnaire includes questions about an arrestee's mental and/or physical status and relevant physical and mental health history.   The defendants, including but not limited to Defendants Johnson, Chute, SHJB3, and/or Defendant John Doe Intake Screening Nurse/Officer, had the responsibility to accurately and adequately take down Nicholas Colbert's medical and mental health information but they failed to do so.   Despite the fact that Nicoloas Colbert was suffering from substance abuse, drug withdrawal, mental health issues, had a prior suicide attempt approximately five (5) weeks prior to his booking, and otherwise presented with observable signs and symptoms of being in a state of distress and despair, the defendants failed to adequately address these issues.   Specifically, these defendants failed to adequately and accurately obtain a medical history from Nicholas Colbert, and failed to adequately and/or accurately fill out Nicholas Colbert's Pre-Screening Questionnaire or other similar medical intake screening form.   Having been informed of Nicholas Colbert's prior suicide attempt, they also failed to take the proper and legally necessary steps to ensure Nicholas Colbert was taken to see a mental health professional.   These defendants also had a duty to report Nicholas Colbert's history and symptoms to supervisors and other jail staff to ensure a continuum of care.   Similarly, these defendants had the same duty relative to Nicholas Colbert's physical and medical well-being,

including making sure that he received care for those signs and symptoms which were related to his drug abuse and/or withdrawal. These defendants failed in this regard.

29.     The defendants, including but not limited to Defendants C.O. Johnson, SHJB3, Chute, nor John Doe Intake Screening Nurse/Officer, did not have medical or mental health experience, mental health training, or education in mental health issues. Nor did they have any knowledge, training or experience regarding an inmates need for medical and/or psychological attention.

30.     During the course of the intake process, Nicholas Colbert was honest and candid. He informed the intake officers that he had a history of attempting suicide or other self-harm.

31.     Cuyahoga County was also expressly put on notice that Nicholas Colbert was or was likely under the influence of narcotics and/or was experiencing withdrawal symptoms from these drugs such that he required medical attention.

32.     Cuyahoga County was therefore put on notice of Nicholas Colbert's serious medical needs which also constituted an emergency and were therefore obligated to provide him with medical attention and mental health services. Cuyahoga County was also obligated to take proper steps and to have and enforce policies and procedures to prevent Nicholas Colbert from committing suicide or engaging in self-harm.

33.     However, surveillance video of Nicholas Colbert's intake reflects that he was allowed to take the entire string or cord from his sweatshirt/hoodie (which

had been used to tighten the hood part of his sweatshirt). Nicholas Colbert can be seen handling the string and eventually tying it around his waist to hold his pants up.

34. Despite the obvious risks associated with allowing a pre-trial detainee who has a history of suicide/self-harm (and who is or suspected to be under the influence of an illegal substance and/or withdrawing from same) to possess a cord or string of such length and substance such that it could be used for self-harm, the defendants allowed Nicholas Colbert to keep the string.

35. Nicholas Colbert thereafter took his hoodie cord and wrapped it around his waist on the outside of his pants. The cord was not the same color of his pants and was obvious to those observing him. Nicholas Colbert kept this cord around his waist in an objectively observable fashion during the course of his confinement and until he used the cord to hang himself in his cell.

36. The defendants, including but not limited to Defendants, Johnson, SHJB3, John Doe Intake Screening Nurse/Officer, Brown, Chute, Head, Averyheart, John Doe Nurses 1-10 and John Doe Officers 1-10 all had the opportunity to observe Nicholas Colbert with the cord tied around his waist as well as the opportunity and responsibility to take the cord from him but failed to do so.

37. Further, Nicholas Colbert was not provided with an adequate medical screening nor mental health assessment. Nor was he taken to the medical floor/pod for assessment or treatment despite the fact that he objectively evidenced

signs of mental health issues, suicidal ideation, and medical issues stemming from substance abuse and/or the withdrawing from same.

38. The intake records authored by Defendant Chute state that "Patient is withdrawing from multiple substances at this time.", but there are no records indicating Mr. Colbert was given any medication, treatment, counseling, or other care related to his withdrawal. Mr. Colbert was having the medical crisis of multiple substance withdrawal and despite the Defendants being aware of this serious medical condition, Mr. Colbert received no treatment.

39. Nicholas Colbert was thereafter taken to a general population pod where he received no medical attention, medications or mental health treatment.

40. Nicholas Colbert was subjected to discriminatory treatment based on his mental health disability. He was not given any mental health services despite having a known history of mental health issues and at least one prior suicide attempt. Moreover, Metrohealth and Cuyahoga County failed to provide Nicholas Colbert with reasonable accommodations for his mental health needs. As set forth in the statement of facts and the attachments incorporated hereto, these Defendants were aware that pretrial detainees and/or inmates with mental health conditions and needs were being arrested and thereafter detained in their facility. These Defendants failed to provide adequate mental health intake procedures, adequate mental health screening, adequate psychological/psychiatric care, adequate psychological/psychiatric medications, adequate suicide risk assessment, and adequate suicide intervention including but not limited to

physical facilities designed to prevent and/or reduce the possibility of self-harm, including suicide.

41.     The defendants, including but not limited to Defendants Zitello, Chute, Brunello, John Doe Charge Nurse, John Doe Floor Supervisor, John Doe Nurse Manager, and John Doe Nurses 1-10 knew or should have known of Nicholas Colbert's medical history and needs, including but not limited to his history of a recent suicide attempt and need for mental health services.   Having been made aware of Nicholas Colbert's objective need for medical and mental health services, these defendants had a duty to provide adequate medical care and/or to see to it that Nicholas was provided a seamless continuum of care. These Defendants failed in this regard.

42.     On the morning of May 10, 2019, Nicholas Colbert was transferred to a Veteran's Pod.  The Veteran's Pod is an area of the jail specifically designated for pre-trial detainees and/or inmates who have a history of military service.   The "Veteran's Pod" were created for the specific purpose of helping ex-servicemen and women successfully reintegrate into society and is characterized by a focus on programs directed at mental health, addiction and substance abuse treatment.

43.     Despite these purposes and goals, the Veteran's Pod at CCCC provided none of these services.

44.     Corrections Officer Barrington Brown and/or Corrections Officer Robert Head were supposed to be overseeing and providing health and security checks on the veterans housed in the Veteran's Pod.

45.    During the time that Nicholas Colbert was housed in his cell in the Veteran's Pod, he was ignored by CCCC staff and not provided any resources.

46.    Prior to Nicholas Colbert's death, C.O. Brown and C.O Head were not at their assigned stations, did not make rounds, and falsified documents indicating they were checking on inmates/detainees when they were not.  Upon information and belief, C.O. Brown was sleeping during those relevant times that he was in or near the Veteran's Pod.  These errors and omissions were of such a nature that had these defendants fulfilled their duties and legal responsibilities, Nicholas Colbert would have been given proper medical attention and/or would have been observed such that his suicide would have been prevented.

47.    Upon information and belief, Nicholas Colbert was objectively in a state of distress shortly before taking his own life.  Nicholas' demeanor, words, and conduct all indicated that he was in despair and was going to, or was likely going to, take his own life.  Nicholas' demeanor, words, and conduct all also indicated that he was having a medical emergency and/or suffering the effects of withdrawal such that he needed medical attention.  C.O. Brown and/or C.O. Head and John Doe Officers 1-10 ignored and or failed in their obligations to address Nicholas Colbert's objective medical and mental health needs.

48.    On May 10, 2019, Nicholas Colbert went into his cell at the Cuyahoga County Jail.  An honorably discharged veteran and the father of four young girls, Nicholas Colbert was in a state of utter despair.  He had battled drug addiction for years and was desperate to get his life back.  After his arrest in May, 2010 for a

low-level drug charge, his mother, Laura Colbert, was given the opportunity to bail her son out of jail. She made the decision not to bail him out even though she had the funds to do so. Laura Colbert decided that her son Nicholas would be safer in jail than on the streets. She was aware that the CCCC had security guards, medical staff, food, showers, etc. She was concerned about the risk of harm Nicholas might face if he were allowed back out on the streets before getting treatment for his addiction. Laura Colbert relied upon Cuyahoga County to provide a jail that was a safer alternative to the streets. She left Nicholas in the Cuyahoga County Jail to get treatment, to get the help he needed and wanted. Laura's decision was entirely reasonable, advisable, and made with Nicholas Colbert's best interests in mind. She made the decision any loving mother would make.

49.     Sometime after 11:00 am on May 10, 2019, Nicholas Colbert took the hoodie cord he previously pulled from the hood of his sweatshirt, the same one he had wrapped around his waist a couple days earlier. He tied one end to the bunk in his cell and used it to end his life. At 3:05 pm he was pronounced dead by the Cuyahoga County Medical Examiner.

## Evidence of Unconstitutional Customs, Policies, and Practices at the Cuyahoga County Jail

50.     Prior to Nicholas Colbert's, the U.S. Department of Justice, by and through the U.S. Marshals Office, conducted a thorough investigation and audit of the Cuyahoga County Jail.

51. The final report of the U.S. Marshals' investigation, set forth various findings. Some of those findings relative to the Cuyahoga County Jail included:

-   Cuyahoga County Jail staff failed to complete intake screenings in a timely manner;

-   Jail staff failed to report on health, safety, and security measures;

-   Jail staff and inmates feared repercussions for speaking candidly to the U.S. Marshals investigators and U.S. Department of Justice agents;

-   Comprehensive mental health appraisals were not conducted in a timely manner;

-   There existed a backlog of "Kites" (requests by inmates for medical and/or mental health care);

-   No information regarding the six (6) inmate deaths reported to the U.S. Marshals was maintained by the Warden's Office;

-   The Cuyahoga County Jail's staff training curriculum does not consist of policy review and identifying and reporting signs of detainee/inmate mental health decomposition; and

-   The denial of food, toilet paper and other essential items was used as a punitive measure against inmates. Inmates were told to use their clothing for toilet paper. Food was often withheld from prisoners, and they were not provided other basic staples like pens and paper.

52. Prior to Nicholas Colbert's death, the U.S. Department of Justice, by and through the U.S. Marshals Office, conducted a thorough investigation and audit of the Cuyahoga County Jail.

53. Even more significantly, the U.S. Marshals team discovered the following

"SRT members who were escorting detainee/inmates to be interviewed by Facility Review Team members were referring to requested detainee/inmates as "Snitches," as they escorted

them to and from the interview location. The threatening, intimidating, and aggressive behavior demonstrated and witnessed by the Facility Review Team resulted in the request to remove up to 10 detainee/inmates from the CCCC, for fear of SRT members retaliation, and the legitimate fear of detainee/inmate safety."

54. It is significant and shocking that the Cuyahoga County Corrections Officers would intimidate witnesses who were part of a U.S. Department of Justice/U.S. Marshals' investigation. Yet, it is almost incomprehensible that the Cuyahoga County Jail's staff were so brazen as to intimidate witnesses in front of and within earshot of these federal investigators.

55. The same culture and perverse environment that would allow witness intimidation in front of the U.S. Marshals investigators is the same culture and environment that emboldened these Defendants to ignore Nicholas Colbert's medical emergency, and worse yet, to respond to his need for critical care.

56. Further evidence of unconstitutional customs, policies, and/or practices within the Cuyahoga County Jail include those facts which form the basis for charging former Cuyahoga County Jail Warden Eric Ivey with felony charges for tampering with records and falsification.

57. Defendant Warden Ivey ordered Cuyahoga County Corrections Officers to turn off their body cameras. Ivey's actions, made in his official capacity and as a policy maker for Cuyahoga County, created an environment of corruption, neglect, and abuse. By instituting such an offensive policy (eliminating the evidence of inmate abuse, neglect, and other criminal acts), Ivey all but

guaranteed violations of the Constitution such as those suffered by Nicholas Colbert.

58. In addition to the failings detailed in the U.S. Marshals Report, the unconstitutional policies, customs, and practices of the Cuyahoga County Jail are evidenced by the copious number of shocking incidents, some of which are set forth as follows:

- **<u>Brenden Kiekisz</u>**

Brenden Kiekisz committed suicide in the Cuyahoga County Jail when he hanged himself in his cell on December 27, 2018. At the time of Brenden's death, jail officials and corrections officers were very much aware of the unacceptable conditions in the jail and the serious risks that these conditions presented to inmates such as Brenden. The jail had been put on notice of these issues after several previous inmate deaths, warnings and complaints by employees and inmates, and months of scrutiny of the jail's conditions culminating in a thorough and damning report by the U.S. Marshall's released almost two months before Brenden's death. Kiekisz was booked into the jail on Christmas Day on suspicion of violating the terms of his court-ordered drug intervention program. His family had just visited with him and assumed he would be safe in the County Jail. When Kiekisz arrived at the jail, he told a corrections officer that he tried to take his own life two days earlier, according to records obtained by cleveland.com. He never received a medical screening. Brenden had a hearing on December 27 where then-Cuyahoga

County Common Pleas Judge Michael Donnelly ruled that he be removed from the jail and transferred to an in-patient treatment center in Highland Hills. While awaiting the transfer, the guards took Kiekisz back to the jail, and they later found him hanging in his cell. No intake protocols were followed, no preventative measures were taken. Despite being on actual notice of Brenden's history of mental health issues and suicidal ideations, Cuyahoga County did nothing to prevent Brenden from hanging himself. Tragically, Brenden died three days later at the hospital.

- **Esteben Parra**

On June 23, 2018, Esteban Parra, a 32-year old son, brother, and father of two children, died while in the care and custody of Cuyahoga County. Esteben was experiencing drug toxicity and repeatedly asked for medical help. Esteben was objectively in a medical crisis and was wilfully ignored by officers, nurses, and doctors as his crisis mounted, and his suffering increased. Instead of treating his life-threatening condition, jail staff strapped Esteben to a restraint chair in a cruel gesture of disregard. Despite repeated grievances, obvious warnings, and a well-known history of abuse and horrible conditions within the Cuyahoga County jail, Esteben Parra senselessly lost his life. Cuyahoga County bears responsibility for the lack of medical attention required by law as well as the respect and human decency that Esteban deserved and should have received.

- **Joseph Arquillo**

On August 27, 2018, Mr. Arguillo was an inmate at the Cuyahoga County Corrections Center. Mr. Arguillo suffered a medical emergency while in the care and custody of Cuyahoga County. However, rather than provide Mr. Arguillo emergency medical assistance, a corrections officer came up to a prone Mr. Arguillo, kicked the mat he was lying on, and walked away. Other inmates called Mr. Arguillo's condition to the attention of other Cuyahoga County Jail staff, and their pleas were ignored. Mr. Arguillo died in the Cuyahoga County Jail.

- **Gregory Fox**

Gregory Fox, a 36-year-old man, was a pretrial detainee at the Cuyahoga County Jail in August 2018. Jail employees failed to provide Mr. Fox with necessary mental health care and medication and failed to take necessary steps to prevent his suicide. As a result, Mr. Fox committed suicide in his cell.

- **Ms. Chantelle Glass**

Ms. Glass was taken into the Cuyahoga County Jail based on an old misdemeanor warrant out of New Jersey. Ms. Glass requested to call her family so they could find a lawyer to resolve this issue. The jail staff refused. In retaliation for repeatedly requesting to use the phone, Ms. Glass was assaulted and forced into a restraint chair, despite the fact that she was being compliant. Thereafter, Ms. Glass was violently struck and had an entire can of pepper spray emptied into her face, all while Ms. Glass was restrained. When

Ms. Glass asked why she was maced, C.O. Clark responded, "Because you talk too much."

- **Mr. Joshua Castleberry**

Mr. Castleberry snuck an extra bologna sandwich from the commissary with the intention of eating it in his cell. When he was caught, Mr. Castleberry threw the bologna sandwich at the corrections staff. In response, Corrections Officers John Wilson and Jason Jozwiak handcuffed Mr. Castleberry then savagely "smashed Mr. Castleberry's face so violently into the ground that his front teeth came out of his nose. They placed him in a restraint chair and jammed a mask over his broken face to conceal their assault from medical staff."

- **Mr. Tyrone Hipps, Jr.**

On November 1, 2018, Mr. Hipps, a Muslim inmate in the Cuyahoga County Jail, was interviewed by the U.S. Marshals Service Quality Assurance Review Team regarding the conditions in the Cuyahoga County Jail. Mr. Hipps provided information regarding the abuses and inhumane conditions inside the jail. Two days later, a Special Response Team (SRT) member, Officer Perdue, refused to let Mr. Hipps pray in an area and in a fashion where he had previously been allowed. In direct retaliation for providing information to the U.S. Marshals investigators, and in violation of Mr. Hipps' First and Fourteenth Amendment rights, Officer Perdue put Mr. Hipps in a chokehold and slammed him headfirst into the ground. Officer Perdue also altered his

bodycam so as to prevent his abuse from being recordedMr. Hipps was further retaliated against by being placed in solitary confinement ("the hole").

- **Mr. Corrione Lawrence**

During the course of being processed into the Cuyahoga County Jail, Mr. Lawrence responded to questions in Spanish. The booking officer and other jail staff decided that Mr. Lawrence was simply being difficult by responding in Spanish, so as punishment, they placed him in the restraint chair. Mr. Lawrence was strapped down to a chair and forced to sit in a freezing cold room for approximately four (4) hours as punishment. Thereafter, Mr. Lawrence was placed in a pod with his cousin's murderer, despite the fact that Mr. Lawrence specifically asked to be placed in any other pod except the one where this murderer was housed. Mr. Lawrence feared he would be attacked. Not surprisingly, the man who murdered Mr. Lawrence's cousin attacked Mr. Lawrence, but he was never punished or brought to justice. Rather, Mr. Lawrence was physically beaten by corrections officers and sustained serious injuries. He was thereafter denied adequate medical attention. Mr. Lawrence was further retaliated against by being placed in isolation and was denied the ability to take a shower.

- **Mr. Glenn Mayer, Jr.**

Mr. Mayer suffered from a neurological condition which caused him to have involuntary spasms or "twitches." The staff at the Cuyahoga County Jail knew of Mr. Mayer's condition. While Mr. Mayer was being handed

medication, he experienced a spasm.  Corrections Officer Hayes witnessed this twitch and assaulted Mr. Mayer, squeezing his neck and slamming Mr. Mayer's elbow.  The physical assault on Mr. Mayer went unpunished and Officer Hayes continued to harass and intimidate Mr. Mayer.  Further, Mr. Mayer was denied adequate medical care despite an obvious need.

- **Mr. David Frunza**

Mr. Frunza was an inmate in the Cuyahoga County Jail who suffered from an epidural abscess and a spinal infection.  Mr. Frunza's condition was obvious and objectively serious.  Despite the seriousness of his conditions, the staff at the Cuyahoga County Jail failed to treat Mr. Frunza.  As a result of the Cuyahoga County Jail staff failing to treat Mr. Frunza's serious medical condition, he suffered excruciating pain for approximately forty-two (42) days and now has permanent physical damage and emotional distress.

- **Ms. Tonya Clay, et al.**

On May 17, 2019, Ms. Tonya Clay and other Plaintiffs filed a lawsuit against Cuyahoga County and various other officials and individuals based on the inhumane conditions inside the Cuyahoga County Jail.  Plaintiffs' Complaint details how Cuyahoga County has adopted customs, policies, and practices which are inhumane, pervasive, and unconstitutional.  As a direct and proximate result of these same unconstitutional customs, policies, and practices, Nicholas Colbert suffered physical injury, emotional distress, violations of his Constitutional rights, and other losses and damages.

59.     The aforementioned individuals all experienced a violation of their Constitutional rights, either as a result of abuse at the hands of corrections officers or were otherwise treated with deliberate indifference to a serious medical problem.

60.     However, the aforementioned incidents do not constitute an exhaustive list.     There have been other similar incidents of excessive force, the denial of medical care, and the neglect and abuse of inmates with mental health issues—all of which demonstrate an environment of unlawful policies, customs, and practices.

61.     Despite Defendants' knowledge of Nicholas Colbert's need for proper medical screening and emergency medical care, they were deliberately and callously indifferent to his risk of more serious injury and death.

62.     The Defendants failed to offer or procure appropriate intervention and precautions for Nicholas Colbert's serious, immediate, and life-threatening conditions.

63.     Defendants jointly agreed and/or conspired with one another, and others, to complete false, misleading, and incomplete official reports and to give a false, misleading, and incomplete version of the events to certain superiors and the public in order to cover up their own misconduct and failure to properly care for Nicholas Colbert.

64. All of the actions of the Defendants and their named and unnamed co-conspirators, as set forth above and below, were taken jointly, in concert, and with shared intent.

65. All Defendants had a duty to care for and protect Nicholas Colbert while he was in their custody, and they failed to do so.

66. Defendants were deliberately indifferent to protecting Nicholas Colbert from harm and failed to prevent said harm; furthermore, they failed to provide urgently needed medical and other health care. Their conduct was unreasonable in failing to protect Nicholas Colbert from harm.

67. Upon information and belief, no correctional officer, medical provider, or other Cuyahoga County Corrections Center employee has been disciplined in any way as a result of the conduct, acts, or omissions described in this Complaint.

68. As a direct and proximate result of these Defendants' actions, as detailed above, Nicholas Colbert and his heirs suffered, inter alia, injury, pain, distress, loss of love, affection, society, companionship, and consortium as well as other injuries as a result of his death and the continuing loss of his life.

69. The injuries suffered by Nicholas Colbert were all preventable had Defendants not engaged in illegal conduct in violation of his fundamental rights.

70. Defendant Cuyahoga County ("the County") is responsible for the Cuyahoga County Corrections Center (CCCC), including the care and treatment of Detainees/Inmates—like Nicholas Colbert—in custody therein. The County is required to ensure that the policies, practices, and customs of the CCCC comply

with federal and Ohio law concerning the treatment of persons in custody.

71.     Unconstitutional and deplorable conditions in the CCCC are a historic problem. Defendants have long been on notice of—and have even taken action to worsen—these conditions and have long been on notice of the incompetent supervision and management of the CCCC.

72.     The CCCC has been subjected to federal court monitoring at least twice in response to unconstitutional conditions of confinement within the jail.

73.     The County's track record of operating the CCCC demonstrates longstanding, systematically unconstitutional operational procedures.

74.     CCCC today operates in complete crisis. Upon information and belief, at least nine people have died in CCCC since 2018, including Nicholas Colbert, and over 55 people attempted suicide while in CCCC custody in 2018. The rates of in-custody deaths, assaults by correctional officers, deprivations of basic human rights, and safety of Detainees/Inmates and staff alike have all reached emergency levels.

75.     It has been reported that, after each death, someone confiscated the housing unit logs from the time of the death and replaced them with new logs.

76.     Detainees/Inmates and their families have raised innumerable concerns and complaints about deplorable conditions. Some CCCC staff have quit their jobs in protest. Other stakeholders, including judges in the Cleveland Municipal Court and Cuyahoga Common Pleas Court, have expressed serious concern over jail conditions and the manner in which the facility is being operated.

77. As of November 2017, the Ohio Department of Rehabilitation and Corrections (ODRC) Bureau of Adult Detention inspection found CCCC was not in compliance with Ohio's Minimum Standards for Adult Detention Centers.

78. Likewise, the Pretrial Justice Institute (PJI) found in 2017 that CCCC was overcrowded. The PJI report found that on average, CCCC has been operating at over 100% capacity for four of the past five years. (*See* Pretrial Justice Institute, "Enhancing Pretrial Justice in Cuyahoga County: Results from a Jail Population Analysis and Judicial Feedback," September 2017).

79. Further, the Cuyahoga County Bail Task Force found in March 2018, that Inmates/Detainees remain in CCCC custody for unnecessarily long periods of time.

80. The County has long been on notice of overcrowding and medical and mental health issues—since at least 2017—but has not remedied this critical problem and instead has increased overcrowding.

81. Further, as indicated, the United States Marshals Service (USMS) issued a report on November 21, 2018, condemning the conditions in the CCCC. This report documented numerous failings discovered in USMS's thorough review of conditions, policies, and practices at CCCC. The report concluded that conditions in CCCC are inhumane and dangerous for both Inmates/Detainees and corrections officers.

82.     The USMS Report found the CCCC deficient in, *inter alia,* intake procedures, the provision of medical care, inmate abuses, violations of Constitutional rights, and other violations relevant to Nicholas Colbert's claims.

83.     The USMS report found that CCCC is severely overcrowded and identified 96 corrections officer vacancies, indicating severe understaffing. The report states, "as a result of the high vacancy rate and excessive staff call outs, the CCCCs daily operation is greatly impacted regarding provision for detainees'/ inmates' basic needs."

84.     USMS's documentation of deficiencies in intake evaluations, medical care, and dangerously low understaffing is consistent with the experience of Nicholas Colbert.

85.     As evidenced in the USMS report and Plaintiffs' accounts, CCCC is in violation of the Ohio minimum jail standards, as defined in Ohio Admin. Code § 5120:1-8, pertaining to operation of full-service jails in the State of Ohio. Violations Ohio Admin. Code § 5120:1-8 include, but are not limited to:

-        Failure to arrange for all levels of health care, including initial screenings upon booking and including ongoing mental health care, and failure to assure quality, accessible, and timely services for inmates;

-        Failure to ensure that all health and mental health personnel are appropriately credentialed, with verification of current credentials on file at the facility;

-       Failure to provide a daily procedure whereby inmates have an opportunity to report medical and mental health complaints through health-trained personnel, or for urgent matters, to any jail employee, along with failure to provide a grievance system for medical and mental health treatment, where daily complaints and grievances are addressed in a timely manner, recorded and maintained on file, reviewed daily by a qualified health care personnel, and treatment or follow-up are provided as necessary; and

-       Failure to maintain accurate health/mental health records in written or electronic format.

### Former CCC Official Removed Over Public Statements about Denial of Detainees'/Inmates' Access to Adequate Medical Care

86.     Gary Brack, former Director of Ambulatory Care at CCCC, spoke out against the conditions at CCCC at a May 2018, Cuyahoga County Council meeting. Brack blamed former Director of Regional Corrections Kenneth Mills "for meddling in jail healthcare, obstructing the hiring of nurses, and creating an unsafe environment for staff by scaling back security in the jail's medical unit." (*See* Adam Ferrise, "Ex-Cuyahoga County Jail Supervisor Subpoenaed to testify before Grand  Jury,"  *Cleveland.com* (Dec. 10, 2018).

87.     Rather than launching an investigation into the medical care crisis at the CCCC or investigating whether Mills was fit to continue in the director position, Defendant Budish removed Gary Brack because Brack was outspoken and critical against Mills.

88.    County spokeswoman Mary Louise Madigan characterized this conflict, noting that "Armond [Budish] did have a meeting at Metro. It was clear that Mr. Brack and the jail director, Ken Mills, didn't work well together, and we asked that he not be returned to his position at the jail."   (*See* Courtney Astolfi and Adam Ferrise, "Budish Personally Requested Ouster of County Jail's Medical Supervisor Who Criticized Jail Administration," *Cleveland.com* (Dec. 13, 2018).

89.    After Brack's appearance at the May 2018, County Council meeting, at least seven inmates died in Cuyahoga County's custody within a span of barely four months, including inmates likely not receiving proper psychiatric and/or medical care.

90.    Defendant Cuyahoga County provided improperly redacted records concerning the deaths to members of the media. Though the County subsequently provided unredacted records, full records about these deaths have not been released to the media or the public. (*See* Adam Ferrise, "Death of Cuyahoga County Jail inmate subject of criminal investigation: What we know about 7 jail deaths," *Cleveland.com* (Nov. 21, 2018)).

91.    Though County Executive Armond Budish has publicly stated that CCCC is the largest mental health provider in Ohio, upon information and belief, CCCC has not had a staff psychiatrist since April 2018, and only one nurse practitioner administers mental health care 10 hours a day, four days a week. CCCC does not offer any mental health care for the rest of the time.

92.     Lack of adequate staffing of corrections officers further exacerbates the denial of access to medical and mental health care because there are not sufficient corrections officers to escort Detainees/Inmates to and from the medical and mental health units.

93.     In June 2018, a state inspector found that CCCC failed to complete required intake medical assessments within the legally required timeframe.

94.     This delay results in Detainees/Inmates with serious mental health and medical needs being denied proper care and necessary medication and/or treatment when they enter CCCC facilities.

95.     Marcus Harris, former jail nursing director, has also stated that inmates at the Euclid Jail, also run by Defendant Cuyahoga County under regionalization of jail operations, often did not receive the required initial medical assessment upon booking, leaving medical conditions unchecked for days.

96.     In May 2018, Mr. Harris stated that he quit his job at CCCC in January amid inmate safety and ethics concerns. He believes the conditions at CCCC were so unsafe that "every day when [he] went to work [he] had to wonder if someone was going to be dead or assaulted." (*See* Courtney Astolfi, "Inmates deprived of proper medical care under Cuyahoga County jail director, former nursing supervisor says," *Cleveland.com* (May 31, 2018)).

97.     Compounding medical and mental health issues, CCCC regularly denies Detainees/Inmates access to necessary hygiene products, including sanitary pads

and soap, and access to sufficient cleaning supplies to attempt to keep their own living areas, bedding, and clothing clean and sanitary.

98.    Defendants lack adequate policies, practices, training, and supervision for staff concerning how to respond to detainees/inmates having drug intoxication.

99.    Though County Executive Armond Budish has publicly stated that CCCC is the largest mental health provider in Ohio, upon information and belief, CCCC has not had a staff psychiatrist since April 2018, and only one nurse practitioner administers mental health care 10 hours a day, four days a week. CCCC does not offer any mental health care for the rest of the time.

100.    Lack of adequate staffing of corrections officers further exacerbates the denial of access to medical and mental health care because there are not sufficient corrections officers to escort Detainees/Inmates to and from the medical and mental health units.

101.    In June 2018, a state inspector found that CCCC failed to complete required intake medical assessments within the legally required timeframe.

102.    This delay results in Detainees/Inmates with serious mental health and medical needs being denied proper care and necessary medication and/or treatment when they enter CCCC facilities.

103.    Defendants lack adequate policies, practices, training, and supervision for staff concerning how to respond to detainees/inmates having drug intoxication.

104. Also relevant is the Cuyahoga County Agency of Inspector General, "Cuyahoga County Corrections Center Report of Investigation, February 12, 2019" by Mark D. Griffin.

105. In the Inspector General's report, evidence of inadequate staffing; the unlawful practice of "Red Zoning"; inadequate correctional staffing; inadequate housing; inadequate mental health care; inadequate physical health care; the failure to provide medications; inadequate health care staff; failures related to performing health care assessments; deceptive, fraudulent and inaccurate record keeping relative to work assignments, inmate health care records, mental health assessments, physical health assessments, and incidents of violations of inmates rights; the destruction of public records and evidence related to inmate rights and well-being; and other systemic failures - all stemming from Cuyahoga County's unlawful customs, policies and practices, is laid bare. Many of these violations stemmed from the decision to regionalize the Cuyahoga County Corrections Center *and* stemmed from the administrative decision to profit off of the inmates at the expense of their health, well-being and rights.

106. All of these issues were matters covered in the criminal case against former CCCC Director, Mr. Kenneth Mills in the case, *State of Ohio v. Mills,* Cuyahoga County Court of Common Pleas, Case No.: CR-19-645266. In Mr. Mills trial, evidence was presented of unlawful policies, customs, and practices in relation to the problems set forth herein. Evidence was specifically presented which demonstrated how the intake process at the CCCC, as well as their record

keeping, was below legal standards. The failure to provide mental health assessments, medications, proper supervision, punishing inmates with health concerns instead of providing them treatment, inadequate training relative to suicide prevention and health assessments were all part of what was presented to a jury. These issues, as set forth herein, persisted in the CCCC such that these same problems were in existence when Plaintiff was incarcerated at the CCCC in July, 2019. See also the 2019 ODRC investigation relative to the CCCC as authored by ODRC Investigator and witness in the Mills trial, Mr. Joel Commins, attached hereto as Exhibit 2.

107. The unconstitutional policies, customs, practices, as well as Defendants Cuyahoga County and Metrohealth's failure to adequately train and supervise their employees and/or agents, were the driving force behind Nicholas Colbert's loss of life. As set forth above and herein, Plaintiff's claims and allegations are also supported by the trial testimony of those witnesses who testified during the criminal trial of former Cuyahoga County Corrections Center Director, Mr. Kenneth Mills. Some of the testimony in *State of Ohio v. Mills*, Cuyahoga County Court of Common Pleas, Case No.: CR-19-645266, attached hereto, includes the sworn, first-hand accounts of the following officials, employees, investigators, and other individuals intimately familiar with the policies, customs and practices of the CCCC during the time frame at issue: Ms. Sicily Woods (Exhibit 3), Mr. Earl Leiken (Exhibit 4), Mr. Clifford Pinkney (Exhibit 5), Dr. Thomas Tallman (Exhibit 6), Mr. Gary Brack (Exhibit 7), Mr. Joel Commins

(Exhibit 8), and Mr. Marcus Harris (Exhibit 9).   Other officials, employees, investigators, and individuals with first-hand knowledge also testified to facts which support Plaintiff Nicholas Colbert's claims pursuant to *Monell.*

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 Against Defendants for Deliberate Indifference to Serious Medical Needs in Violation of the Eighth and/or Fourteenth and/or Fourth Amendment

108.    Paragraphs 1 through 107 are incorporated by reference herein as if fully rewritten.

109.    The Defendants observed Nicholas Colbert and objectively knew he was in a state of mental and emotional breakdown.  Cuyahoga County was on actual notice of Nicholas Colbert's physical symptoms, mental impairment, and the fact that he was suicidal and needed mental health intervention as well as mental health medications.

110.    These Defendants were put on actual notice that Nicholas Colbert was in the throes of a physical crisis and a mental health crisis.  The records of Nicholas Colbert's intake reflect that he was going through the crisis of multiple-substance withdrawal at the time of his intake yet he was denied any medical care, medication, or other treatment for his crisis.

111.    Defendants knew, both by report and by observation, that Nicholas Colbert required psychiatric intervention and hospitalization for his conditions, including but not limited to suicidal ideation and/or drug withdrawal.

112.    The Defendants were aware, based on prior treatments of Nicholas Colbert and as reflected in their records, that Nicholas suffered from mental health

conditions and was suicidal as well as suffering from substance abuse and drug dependency.

113.    Nicholas Colbert was entitled to care and treatment for his serious medical condition.

114.    Defendants callously failed to respond to Nicholas Colbert's medical condition and need for emergency psychiatric intervention and medications.

115.    None of these Defendants, despite their legal duties, responded to Nicholas Colbert's emergency medical needs.

116.    The Defendants' response to Nicholas Colbert's serious medical needs was objectively unreasonable.   The individual defendants had notice of Nicolas' medical needs.   They knew those medical needs were serious.   The defendants were capable of providing mental health care, including measures to prevent Nicholas Colbert's suicide, but they failed to do so.    And no police, administrative, penological or other investigatory concern existed such that Nicholas Colbert should have been denied the medical care and attention he desperately needed.

117.    Indeed, both Cuyahoga County and MetroHealth were expressly aware that the Cuyahoga County Corrections Center was not providing adequate medical care relative to its pretrial detainees/inmates - specifically in relation to those with mental health issues and/or suicidal ideation.   These defendants, by and through their employees, agents and officials, had notice of Nicolas Colbert's medical needs.   They knew those medical needs were serious.   The defendants were

capable of providing mental health care, including measures to prevent Nicholas Colbert's suicide, but they failed to do so. And no police, administrative, penological or other investigatory concern existed such that Nicholas Colbert should have been denied the medical care and attention he desperately needed. As such, the denial of Nicholas' medical care was objectively unreasonable.

118. Rather, and based on the facts set forth herein, these Defendants delayed and therefore interfered with Nicholas Colbert obtaining necessary and life-saving medical care. As such, their conduct in this regard was willful, wanton, reckless, and malicious as well as a violation of his Constitutional rights.

119. Defendants were therefore deliberately indifferent to Nicholas Colbert's serious medical needs in violation of his rights as protected by the Eighth, Fourth, and/or Fourteenth Amendments to the United States Constitution.

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 Supervisory Liability Against Defendants)

120. Paragraphs 1 through 119 are incorporated by reference herein as if fully rewritten.

121. Defendants Budish, Leiken, Mills, Ivey, Tallman, Brunello, Zitello, Chute, John Doe Floor Supervisor, John Doe Charge Nurse, John Doe Nurse Manager, MetroHealth and Cuyahoga County (the supervisory Defendants) are liable in their role as supervisors.

122. As alleged herein, Nicholas Colbert's rights were violated by Cuyahoga County Defendants as outlined herein.

123.    The supervisory Defendants were personally and individually involved in the violation of Nicholas Colbert's rights by, among other acts:

    i.    Directly participating in the conduct of subordinate Defendants by acquiescing to and failing to intervene to correct the actions of the subordinates once it was known that these actions were occurring;

    ii.    Failing to train their subordinates, including these named Defendants, on topics including but not limited to engaging in crisis interventions, interacting with suicidal, depressed and/or bipolar individuals or individuals who they know or have reason to believe are experiencing the ill effects of a mental health crisis and other topics relevant and set forth herein when the need for additional training was apparent throughout their actions and inactions, creating a policy, practice, or custom in which violations occurred;

    iii.    Consistently failing to supervise and train their subordinates, including these named Defendants, such that the violation of a citizen's rights were highly predictable under the usual and recurring circumstances and did occur against Nicholas Colbert in the manner predicted;

    iv.    Remaining deliberately indifferent to and consciously disregarding the rights of citizens and civilians by failing to act on information that Constitutional rights were being violated.

124.    The supervisory Defendants' failures to supervise and train, and their participation in the conduct of their subordinates was affirmatively linked to the violations of Nicholas Colbert's state and federally protected rights.

125.    As a direct and proximate result of the supervisory Defendants' failure to supervise and train their subordinates, and in participating in their course of conduct, Nicholas Colbert was forced to endure and suffer severe physical, mental and emotional injuries, and death.

**126.**     In failing to train and supervise and by participating in their subordinates' conduct, the supervisory Defendants acted wantonly, willfully, recklessly, maliciously, without legal justification, and with deliberate indifference to Nicholas Colbert's federally protected rights warranting the imposition of exemplary punitive damages.

### THIRD CAUSE OF ACTION
### (Willful, Wanton, Reckless, Malicious, and Bad Faith Conduct Against Defendants)

127.     Paragraphs 1 through 126 are incorporated by reference herein as if fully rewritten.

128.     As set forth herein, the Defendants failed to exercise due care and acted in a willful, wanton, reckless, malicious, and/or in bad faith manner while acting in the course and scope of their employment and under color of law which culminated in the death of Nicholas Colbert such that they are not entitled to the defenses and immunities for negligent conduct as set forth in O.R.C. §2744.01 *et seq.*

129.     The Defendants failed to recognize and/or ignored the fact that Nicholas Colbert was experiencing an emergency mental health crisis and needed immediate medical attention. They failed to intervene on behalf of Nicholas Colbert despite appreciating his serious medical needs and having the opportunity to intervene on his behalf, and they also took ill-advised steps which were contrary to training and procedures.   They failed to provide suicide prevention assistance, drug withdrawal treatment, and other emergency medical care.   They took steps which hindered the provision of medical care.   They failed, in one way

or another, to protect Nicholas Colbert's civil rights and/or to prevent his rights from being violated. These mistakes and other mistakes as set forth herein were made in a wanton, willful, reckless, and/or malicious manner.

130.  The failure of these Defendants to treat Nicholas Colbert's medical emergency is what led to him suffering bodily harm, emotional distress, and death.

131.  As a direct and proximate result of these Defendants' acts and omissions as set forth herein, Nicholas Colbert suffered severe physical injuries, emotional and mental distress, and death.


## FOURTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress Against Defendants)

132.  Paragraphs 1 through 131 are incorporated by reference herein as if fully rewritten.

133.  Defendants either intended to cause emotional distress or knew or should have known that their actions would result in serious emotional distress to Nicholas Colbert.

134.  These Defendants engaged in conduct so outrageous as to go beyond all possible bounds of decency and was utterly intolerable in a civil society.

135.  As a direct and proximate result of these Defendants' actions and inactions, Nicholas Colbert suffered psychic injury prior to his death; and the mental anguish suffered by Nicholas Colbert was serious and of a nature that no reasonable person could be expected to endure.

136.     These Defendants' infliction of emotional distress was also willful, wanton, reckless, malicious, and/or in bad faith.

### FIFTH CAUSE OF ACTION
### (Negligent Hiring, Training, Retention, Discipline and Supervision)

137.     Paragraphs 1 through 136 are incorporated by reference herein as if fully rewritten.

138.     Defendants Budish, Leiken, Mills, Ivey, Tallman, Brunello, Zitello, Chute, John Doe Floor Supervisor, John Doe Charge Nurse, John Doe Nurse Manager and Cuyahoga County (the supervisory Defendants) employed and/or supervised the non-supervisory Defendants and knew or should have known that these employees had a propensity for failing to provide medical care, failing to provide adequate medical care, failing to perform intake evaluations, failing to perform meaningful health screenings and evaluations, not intervening on behalf of inmates when there is both the need and the legal duty to do so, destroying evidence, misleading other officials in their analysis of the Cuyahoga County Jail, and acting with deliberate indifference to the serious medical needs of individuals under their care, custody, and control, and otherwise acting or failing to act in an appropriate manner consistent with their legal duties in situations similar to the one they faced with Nicholas Colbert.

139.     These supervisory defendants also failed to adequately train these employees relative to providing adequate medical care, performing intake evaluations, performing meaningful health screenings and evaluations, intervening on behalf of an inmate, recognizing emergency conditions, destroying

evidence, misleading other officials in their evaluation of the Cuyahoga County Jail, and acting with deliberate indifference to the serious medical needs of individual and other areas of training relevant to the matter herein which on their face were violative of the Fourth, Eighth and/or Fourteenth Amendment and otherwise acting in an appropriate manner consistent with their legal duties in situations similar to the one they faced with Nicholas Colbert and further was the direct and proximate cause of Nicholas Colbert's severe physical pain, emotional and mental distress, and death.

## SIXTH CAUSE OF ACTION
### (Failure to Intervene)

140.    Paragraphs 1 through 140 are incorporated by reference herein as if fully rewritten.

141.    Defendants as set forth herein all had the opportunity as well as the legal duty to intervene on behalf of Nicholas Colbert so as to prevent his rights from being violated, or to curtail the violation of his rights.

142.    Each of these Defendants failed in this regard and are therefore liable.

143.    These Defendants actions and inactions were under color of law and deprived Nicholas Colbert of federally protected rights.

144.    These Defendants actions and inactions were willful, wanton, reckless and/or malicious and also deprived Nicholas Colbert of his rights under the State of Ohio and the Ohio Constitution.

145.     As a direct and proximate result of the wrongful acts and omissions as set forth herein, these Defendants caused Nicholas Colbert to suffer extreme physical pain, severe mental and emotional distress, and loss of life.

## SEVENTH CAUSE OF ACTION
### (Wrongful Death)

146.     Paragraphs 1 through 145 are incorporated by reference herein as if fully rewritten.

147.     As a direct and proximate result of the Defendants' acts and omissions as set forth herein, individually, and/or collectively, Plaintiff's Decedent, Nicholas Colbert, suffered his untimely and wrongful death.

148.     As a direct and proximate result of Nicholas Colbert's wrongful death, Nicholas' next of kin have and will forever suffer those injuries and damages as set forth in Ohio's wrongful death statutes.

149.     Daniel Colbert, Nicholas' Brother, is the Administrator of Nicholas Colbert's Estate.  Daniel Colbert brings this action pursuant to Ohio Revised Code §2125.02, *et seq.*

## EIGHTH CAUSE OF ACTION
### (Survivorship Action)

150.     Paragraphs 1 through 149 are incorporated by reference herein as if fully rewritten.

**151.**     As the Administrator of the Estate of Nicholas Colbert, Plaintiff Daniel Colbert also brings this action for the injuries, conscious pain and suffering, and

all other damages his brother, Nicholas Colbert, suffered prior his death and for the benefit of his Estate.

## NINTH CAUSE OF ACTION
### (5TH AND 14TH DUE PROCESS AND 4TH AMENDMENT)

152. Paragraphs 1 through 151 are incorporated herein by reference as if fully rewritten.

153. The facts as set forth herein establish that Nicholas Colbert, an individual with diagnosed mental health conditions, was in a special relationship with the Defendants within the meaning of the case law interpreting 42 U.S.C. §1983 and the Fifth Amendment, which guarantees equal protection of the laws and prohibits any person acting under color of law from subjecting any person in custody to punitive conditions of confinement without due process of law.

154. Defendants, acting under the color of law, intentionally and with conscious, callous, and unreasonable indifference deprived Nicholas Colbert of his constitutional rights to due process and equal protection.

155. The Defendants' conduct, as described herein, their acts and/or omissions constituted deliberate indifference to Nicholas Colbert's medical needs, was unreasonable and violated his rights under the Fifth Amendment and Fourteenth Amendment to the United States Constitution to due process of law and equal protection and therefore violated 42 U.S.C. §1983. These same conditions of confinement, as set forth herein and in the attachments incorporated hereto, also violated Nicholas Colbert's Fourth Amendment rights and were objectively unreasonable.

156.    Defendants' conduct, as described herein, their acts and/or omissions were the direct and proximate cause of the violations of Nicholas Colbert's Fifth, Fourteenth, and/or Fourth Amendment rights, his mental suffering, anguish and other injuries.

157.    Defendants are jointly and severally liable for this conduct.

**TENTH CAUSE OF ACTION**
**(Americans with Disabilities Act and Section 504 Claim)**

158.    Paragraphs 1 through 157 are incorporated herein by reference as if fully rewritten.

159.    Defendant CCCC and/or MetroHealth is and has been a recipient of federal funds, and is covered by the mandate of Section 504 of the 1973 Rehabilitation Act (29 U.S.C. §794).   Section 504 requires that persons with disabilities be reasonably accommodated in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose.

160.    Further, Title II of the Americans with Disabilities Act (42 U.S.C. §§12131-12134) applies to Defendant Cuyahoga County and/or MetroHealth and has essentially the same mandate as that expressed in §504.

161.    The CCCC is a facility and its operations comprises a program and service for §504 and Title II purposes.

162.    Defendants Cuyahoga County and/or MetroHealth failed and refused to reasonably accommodate Nicholas Colbert's mental health conditions and disabilities and to modify their jail facilities, operations, services,

accommodations and programs to reasonably accommodate his disability in violation of Title II of the ADA and/or §504 when he was in their custody.

163.    The Defendants treated Nicholas Colbert in a discriminatory fashion based on his mental health conditions and his need for mental health care.  Other pretrial detainees and/or inmates were provided attention based on their physical injuries and/or trauma.   However, Nicholas Colbert, as a mental health consumer, was denied adequate medical care and treatment.  More specifically, these Defendants failed to provide adequate mental health intake procedures, adequate mental health screening, adequate psychological/psychiatric care, adequate drug and/or multi-substance withdrawal treatment, adequate psychological/psychiatric medications, adequate suicide risk assessment, adequate suicide intervention including but not limited to physical facilities designed to prevent and/or reduce the possibility of self-harm, including suicide.

164.    Defendants' failures directly and proximately caused the death of Nicholas Colbert and the violations of the ADA and/or §504 were the specific proximate cause of his death and the resulting damage to his family and estate.

165.    Plaintiff's estate is entitled to recover for those damages sustained as described in this Complaint as a result of the Defendants' violations of the ADA and §504 which caused Nicholas Colbert's death.

166.    Defendants are jointly and severally liable for this conduct.

## ELEVENTH CAUSE OF ACTION
### (Medical Malpractice)

167.    Paragraphs 1 through 166 are incorporated herein by reference as if fully rewritten.

168.    Defendants had a legal duty to provide Nicholas Colbert with a standard of medical and psychiatric care.

169.    The acts and omissions of the Defendants as outlined herein constitute a breach of the standard of care applicable under these circumstances.

170.    As a direct and proximate result of the Defendants' breach of the standard of care, Nicholas Colbert was forced to suffer pain, distress, anguish and death.

171.    The Defendants are jointly and severally liable for this breach of the standard of care and for the resulting damages.

## TWELFTH CAUSE OF ACTION
### (§1983 *Monell* Claim Against Defendant Cuyahoga County and/or MetroHealth)

172.    Paragraphs 1 through 171 are incorporated herein by reference as if fully rewritten.

173.    The actions of the Defendants were taken pursuant to one or more interrelated *de facto* as well as explicit policies, practices and/or customs of Defendant Cuyahoga County, its officers, agents and/or officials.

174.    The actions of the Defendants were also taken pursuant to one or more interrelated *de facto* as well as explicit policies, practices and/or customs of Defendant MetroHealth, its officers, agents and/or officials.

175.     Defendant Cuyahoga County, acting at the level of official custom, policy, practice and custom, with deliberate, callous, conscious, and unreasonable indifference to Nicholas Colbert's constitutional rights, authorized, tolerated, and institutionalized the practices and ratified the illegal conduct herein described, and at all times material to this Complaint, the Defendant Cuyahoga County, MetroHealth, and/or CCCC, its agents and/or officials had interrelated *de facto* policies, practices, and customs which included but were not limited to:

-       Failing to properly train, supervise, discipline, transfer, monitor, counsel and otherwise control corrections officer, health care providers and other jail staff;

-       Failing to appropriately and timely identify serious mental health medical issues and the needs of pre-trial detainees in a state of mental health crisis such as Nicholas Colbert;

-       Failing to appropriately recognize suicidal ideations and tendencies in pre-trial detainees such as Nicholas Colbert despite objectively clear and obvious indications of mental health issues and a propensity to engage in self-harm;

-       Failing to timely refer pre-trial detainees such as Nicholas Colbert to appropriate mental health providers and for mental health services despite an objectively clear and serious need;

-       Failing to appropriately recognize substance withdrawal and related symptoms in pre-trial detainees such as Nicholas Colbert despite objectively clear and obvious indications of mental health issues and the subsequent propensity to engage in self-harm or suffer other symptoms of withdrawal;

- Failing to timely refer pre-trial detainees such as Nicholas Colbert to appropriate mental health providers or physical health care providers once it was known that Nicholas Colbert was suffering from drug withdrawal and for mental health services despite an objectively clear and serious need;

- Failing to segregate pre-trial detainees such as Nicholas Colbert from the general population and place them on suicide watch and implement suicide precautions;

- Failing to timely and adequately communicate critical information regarding pre-trial detainees such as Nicholas Colbert and who are experiencing a mental health crisis regarding their mental health conditions, withdrawal, and the risk of suicide;

- Failing to provide pre-trial detainees suffering from mental health issues such as Nicholas Colbert with appropriate medications despite being informed of the medications and the need to provide them;

- Ignoring such obvious signs of suicidal ideations, tendencies and other mental health crisis such as a recent suicide attempt and inmates presenting with injuries reflecting or suggesting self-harm;

- Failing to provide adequate intake and screening processes regarding medical and mental health needs. This includes but is not limited to taking adequate steps to ensure that inmates do not have access to instruments of self-harm such as cords or other devices which are known to be used for self-harm and suicide.

-        Failing to train staff regarding the threat of suicide and self-harm associated with inmates and/or pre-trial detainees possessing cords or other means of self-harm and how to address an inmate/detainee with same;

-        Failing to train staff regarding the threat of suicide and self-harm associated with inmates and/or pre-trial detainees suffering from drug and/or multi-substance withdrawal and how to address an inmate/detainee with same;

-        Failing to train jail staff regarding how to respond to an inmate or pre-trial detainee who is presenting in an obvious state of drug withdrawal, despair or threatening self-harm or suicide;

-        Failing to discipline and/or hold staff accountable for ignoring policies and procedures regarding medical assessments, health referrals, screenings, inmates in physical or mental distress, drug withdrawal, suicide or self-harm being threatened by inmates/detainees, and other areas as outlined herein;

-        Allowing log books and other records of employee accountability to be falsified, forged or otherwise made misleading.   This failure of accountability includes failing to discipline employees for engaging in this behavior.   Further, CCCC and/or MetroHealth had a custom, policy and/or practice of facilitating, encouraging, or even instructing staff on how to falsify, forge or otherwise make logs or other records of accountability and work inaccurate;

-        Failing and refusing to correct, discipline, and follow-up on deficiencies noted in the care, treatment and/o supervision of detainees with mental health issues or other health crises such as Nicholas Colbert;

-      Possessing knowledge of deficiencies in the policies, practices, customs and procedures concerning detainees, and approving and/or ratifying and/or deliberately turning a blind eye to those deficiencies.

176.    Specifically, CCCC personnel, correctional officers, health care personnel, and other jail employees are not properly trained relative to performing an intake, assessing new inmates, screening inmates for mental and physical health issues, identifying inmates with health issues, referring and/or dealing with inmates with mental health issues including but not limited to drug withdrawal, suicidal ideations and/or tendencies, and protecting or intervening on behalf of inmates with mental health issues and/or suicidal ideations to protect them from harm.

177.    These policies, practices, procedures and customs as set forth herein both individually and together were maintained and implemented unreasonably and with deliberate indifference.

178.     These policies, practices, procedures and customs as set forth herein both individually and together were encouraged, ratified, and permitted to become part of the accepted practices at the CCCC, and these included but were not limited to failing to adequately observe detainees to identify problematic behavior such as self-harm, failing to adequately screen detainees for mental health issues and further failing to process what information was obtained, failing to appreciate the import of a recent suicide attempt as well as diagnoses of mental health issues, including but not limited to drug withdrawal, and the inmates taking and need to continue taking prescription medication related to his mental health and the

avoidance of self-harming behaviors, failing to respond to the express request for mental health treatment and for suicide prevention measures, failing to ensure that floor cards were not mislabeled, mishandled, forged or otherwise mismanaged such that the failure to manage to floor card system would serve to preclude detainees/inmates from obtaining the mental health or other health treatment they needed.

**Evidence of Policies, Customs and Practices Derived From the Investigation Into the Death of Brenden Kiekisz**

179.    During the course of an investigation into the death of a different CCCC pre-trial detainee, Brenden Kiekisz, law enforcement officials uncovered a trove of evidence reflecting Cuyahoga County and MetroHealth's unconstitutional customs, policies and practices.

180.    For example, during a video interview by investigators, CCCC intake/ screening officer C.O. Marsh indicated that he books everyone into the jail unless they are "intoxicated or bleeding."

181.    As such, when Nicholas Colbert was booked into the CCCC, neither his prior recent suicide attempt, his mental health issues, nor his suspected drug use or withdrawal kept him from being processed in the same way any other inmate would be booked.

182.    C.O. Marsh also offered investigators information about CCCC's policies and procedures relative to inmates who respond that they previously attempted suicide as well as those who are actively contemplating suicide.

183.    Marsh explained that if someone responds that they are actively suicidal, then whoever is "in booking" would notify mental health.

184.    When asked the policy and procedure for someone who indicated that they were recently suicidal, C.O.   Marsh said he didn't know Cuyahoga County's policy or procedure.  C.O. Marsh was unaware if Cuyahoga County even had such a policy or procedure.   C.O. Marsh further responded that if someone has a history of suicide, he would leave that decision up to his supervisor.   The supervisor could contact mental health or not.   C.O Marsh also explained that there is "no protocol" and "I don't know that there is a protocol" for situations involving an inmate who indicates he has a history of attempting suicide.

185.    Upon information and belief, Nicholas Colbert was subjected to the same absence of adequate customs, policies and procedures which led to the death of Brenden Kiekisz, who also committed suicide in the CCCC after expressly informeing jail staff that he had a recent suicide attempt.   Brenden Kiekisz committed suicide in the CCCC on December 27, 2018 - only five (5) months prior to Nicholas Colbert's suicide.

186.    Nicholas Colbert was also given a "floor card."  A floor card is a one-page form that includes information about the inmate.  Critically, it includes where the inmate is housed and their status and/or "classification."   Floor cards are of critical importance in keeping track of inmates and are used to insure that inmates with medical and mental health needs are placed in the correct area or "pods."

187.    Rather than sending Nicholas Colbert to a mental health pod or to medical, Nicholas was initially sent into the jail's general population.  He wasn't sent for a medical or mental health evaluation.   The inadequate and ignored "floor card" system failed Nicholas Colbert in the same way it failed Brenden Kiekisz.

188.    C.O. Marsh's statements regarding CCCC not having adequate policies and protocols is not merely his personal conjecture.   In a separate interview during the Kiekisz investigation, CCCC Cpl. Halloran provided specific and definitive statements relative to the inadequate policies and practices of the Cuyahoga County Jail.   Cpl. Halloran explained that there is **no written policy** regarding what to do with an inmate who has a history of suicide but is not "actively suicidal" (actively meaning being suicidal at the very moment of being questioned regarding suicidal ideation).   Despite the fact that it's the **first question** on the pre-screening questionnaire, apparently no one at the CCCC knew or knows what to do with this critical piece of mental health information. Cpl. Halloran specifically stated, "**As far as I know, there's nothing specifically written for how to handle this**."

189.    Indeed, the Union Steward sitting next to Cpl. Halloran during the course of his interview stemming from this separate jail suicide volunteered, "It's kind of random," when discussing how to deal with someone with a history of prior suicide attempts.

190.    Cpl. Halloran conceded more than once, however, that any indication of a prior suicide should have triggered a mental health assessment.

191.     Cpl. Halloran also repeatedly stated that the jail was short staffed, is chronically understaffed, and that there were not adequate personnel to run the jail.

192.     In addition to expressing his frustration and dismay with the lack of staff and resources in the Cuyahoga County Jail, Cpl. Halloran admitted that he doesn't know the Jail's policies or procedures relative to booking inmates with mental health issues despite the fact that he's a jail supervisor.   Cpl. Halloran also admitted that in his experience, when dealing with inmates who are suicidal, they should be put on suicide precautions which include a suicide blanket and put on a suicide watch.

193.     Also during the Kiekisz death investigation, Cuyahoga County Jail Nurse Estrella Aquino informed law enforcement that Corrections Officers within the jail were ignoring floor cards.   Essentially, it had become the custom, informal or *de facto* policy and custom for detainees and inmates to disregard the very tool that designates where they are supposed to be housed and their status in terms of mental and physical well-being.

194.     Nurse Aquino stated that classification officers and other jail nurses told her that, from their perspectives, if an inmate has been in the jail for 3-4 days, then someone in medical should have already performed an intake assessment on the inmate, and therefore, the C.O.'s get to make the decision to move them into the general population or wherever else they deem fit.   Her statements to law enforcement reflected that the disregard for whether or not an inmate or detainee

had received a medical assessment or a mental health evaluation had become standard practice within the jail.

195.    Investigators also asked Nurse Aquino how the C.O.'s could move inmates from the intake pods to general population pods before they have had their intake assessments and Nurse Aquino stated that **they just do it without asking.**  Again, Nurse Aquino's testimony reflects the poorly kept secret that the actual customs, practices and *de facto* policies of the Cuyahoga County Jail was to disregard inmate medical and mental health needs.

196.    In what can only be described as incredible and courageous testimony, Nurse Aquino explained that ever since the U.S. Marshals performed their analysis of the Cuyahoga County Jail, wherein they found overcrowding and inmates sleeping in hallways and other places on the floor, that Cuyahoga County was put under pressure to move the inmates out of intake pods more quickly.  This meant clearing them out of 7E and 7H intake pods as fast as possible.  So rather than wait for all of these inmates to have their intake assessments performed, the backlog of which was due in part to a lack of adequate medical staff to perform these assessments, **the C.O.s are simply taking the inmates to general population pods without any regard for an assessment.**

197.    Further, when law enforcement asked Nurse Aquino if the C.O.s are allowed to simply take an inmate who hasn't been assessed and place the inmate in a general population pod despite the inmate's potential need for medical attention and/or mental health services, Nurse Aquino stated "I don't think so.

They never ask." Essentially, Nurse Aquino is describing how the Cuyahoga County Jail traded one unconstitutional policy, custom, or practice for a different unconstitutional policy, custom, or practice.

198. In response to this incomprehensible "tug of war" between a depleted medical staff and C.O.'s who are being pressured to move inmates regardless of the inmate's medical and mental health needs, Nurse Aquino explained that she will take floor cards and go into the hallways of the jail calling out the names of inmates who have not yet had their assessments performed. She will then perform assessments and assign the inmate to an appropriate pod. She has been forced to confront C.O.s, telling them "*They haven't had their assessment yet, you can't take them*!". The C.O.s apparently listen to Nurse Aquino and go along with her insistence, but "they don't like it."

199. Also according to Nurse Aquino, this policy, custom, and/or practice is well-known and widespread throughout the CCCC.

200. Nurse Aquino also admitted to instructing various C.O.s to stamp floor cards with the "MEDICAL" stamp, although only **after** she completed an assessment.

201. Perhaps just as important, Nurse Aquino explained that Cuyahoga County Jail nurses are supposed to enter inmate assessments onto IMAX, the inmate information system accessible to jail staff, including corrections officers. As reflected in her video interview, when Nurse Aquino was asked if the jail nurses actually enter this critical information into IMAX so that jail staff can see the

status of a particular inmate, **she laughed and said "No."** The Cuyahoga County Jail nurses are supposed to enter this information into the IMAX system but their policy, custom, and practice is that they simply don't.

202.    In response to being asked why don't the nurses enter this information into IMAX, Nurse Aquino authoritatively stated **"Poor training."**

203.    Nurse Aquino then described how, over the previous 7-10 days, the floor card situation had become chaotic. She explained that she found 8-9 floor cards which were stamped "MEDICAL," despite the fact that two of the cards were for inmates who had not yet had their assessment, and the rest were no longer in jail. Nurse Aquino also stated that she and Nurse Stipek find floor cards, sometimes in the "completed" basket, despite the fact that they aren't completed.

204.    When asked if she told her supervisor about this dangerous, unacceptable, and pervasive situation, Nurse Aquino explained that she doesn't truly know who her supervisor is. She explained that Cuyahoga County never hired a replacement Director of Nursing, and that no one ever explained the chain of command to Nurse Aquino.

205.    Nurse Aquino did, however, state that she and Nurse Stipek had informed Nurse Purnel and Jail Medical Director, Dr. Tallman, about the situation.

206.    Nurse Aquino also told Charge Nurse Chanda Zitiello about the floor cards and the inmates being moved into the general population without being assessed, but according to Nurse Aquino, Nurse Chanda Zitiello has yet to do anything about it.

207.    Nurse Aquino credibly testified relative to the lack of leadership and corrective action as follows: "*There's a lot of that here.  A lot of broken processes.  A lot of no follow through.  It is very difficult.  Everything is word of mouth.  You know like our training is word of mouth.  There's no policies or procedures.  They're outdated.*"

208.    Nicholas Colbert was subjected to the same systemic failures as Brenden Kiekisz.  The inadequate customs, policies and practices that were discovered during the death investigation of Brenden Kiekisz (including but not limited to deficiencies in intake, screening, the floor cards system, continuum of care, the EPIC system, training, discipline and accountability, and others), also directly and proximately led to Nicholas Colbert's death.

209.    Nicholas Colbert went without adequate medical attention at the Cuyahoga County Jail, despite the fact that he truthfully explained to jail staff that he had a history of attempting suicide and objectibely needed medical attention.

210.    Nicholas Colbert was also denied medication despite the fact that the Cuyahoga County Jail knew or should have known that he was suffering the ill effects of drug abuse and/or withdrawal.

211.    Also during the course of the investigation into the death of Brenden Kiekisz, Defendant and former CCCC Warden Eric Ivey was also interviewed relative to the customs, policies, practices, abuses and deaths within the Cuyahoga County Jail.

212.    During Warden Ivey's March 22, 2019 interview, Ivey was asked about

the disturbing number of recent deaths within the County Jail. He testified in part:

> *"There were* [deaths] *that could have been avoided."*

213. Defendant Warden Ivey 's comments that there were deaths in CCCC that "could have been avoided" is, thus far, the highest ranking CCCC official to acknowledge the complete breakdown of a system meant to insure inmate safety.

214. Further, the Constitutional violations and damages to Nicholas Colbert that occurred as described herein were directly and proximately caused by the unofficial and/or official, tacit and/or expressed policies, customs, and practices; and otherwise unconstitutional policies of authorized policy makers of the defendants who deliberately ignored detainees being subjected to unreasonable risk of harm, deliberately ignored violations of appropriate intake and screening procedures, and deliberately failed to supervise and control correctional officers, health care providers and other jail staff so as to prevent a violation of detainees' rights.

215. These interrelated policies, practices, procedures and practices, as set forth herein, both individually and together, were maintained and implemented unreasonably and with deliberate indifference; and, encouraged the defendants to commit the aforementioned acts and omissions relative to Nicholas Colbert and therefore were the direct and proximate causes of the Constitutional violations set forth herein which ultimately resulted in Nicholas Colbert's death.

### THIRTEENTH CAUSE OF ACTION
#### (MetroHealth: Vicarious Liability/*Respondeat Superior*)

216.    Paragraphs 1 through 215 are incorporated herein by reference as if fully rewritten.

217.    Defendant MetroHealth is vicariously liable for some or all of the actions, omissions, and conduct of its officers, representatives, employees, agents, and/or servants as set forth in the preceding paragraphs of this Complaint and under the doctrine of *respondeat superior.*

## DAMAGES

218.    Paragraphs 1 through 217 are incorporated by reference herein as if fully rewritten.

219.    As a direct and proximate result of the Defendants' acts, omissions, and misconduct, Nicholas Colbert sustained, prior to his death, fear for his life and traumatic shock to his physical, mental, and emotional well-being.

220.    As a further direct and proximate result of the Defendants' acts, omissions and misconduct, and as a result of the wrongful death of Nicholas Colbert, his survivors, next of kin, and/or heirs have suffered damages, including but not limited to the loss of his support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education.

221.    As a further direct and proximate result of the wrongful death of Nicholas Colbert, the Decedent's survivors, next of kin, and/or heirs have suffered other damages including but not limited to grief, depression, and severe emotional distress.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Administrator Daniel Colbert prays for judgment against the Defendants, jointly and severally, for:

(A)     Compensatory and consequential damages for all the injuries, damages and losses identified in an amount to be determined by the Court and in excess of Twenty-Five Thousand dollars ($25,000.00);

(B)     Punitive damages in an amount to be determined at trial for the willful, wanton, reckless and malicious conduct of the individually named Cuyahoga County and MetroHealth Defendants;

(C)     Declaratory and injunctive relief against Cuyahoga County and MetroHealth enjoining unlawful policies, practices, procedures and customs and ordering the institution of policies, practices, procedures and training for the Cuyahoga County Corrections Center to bring them into compliance with Constitutional standards;

(E)     All reasonable funeral and burial expenses;

(F)     Attorneys' fees and the costs of this action and other costs that may be associated with this action; and

(G)     Any and all other relief this Court deems equitable, necessary, and just.


Respectfully Submitted,

The Law Office of Paul J. Cristallo

*/s/ Paul J. Cristallo*
PAUL J. CRISTALLO (0061820)
The Brownhoist Building
4403 St. Clair Avenue
Cleveland, OH  44103
T:  440-478-5262
F:  216-881-3928
E:  paul@cristallolaw.com
Counsel for Plaintiff Daniel Colbert, as
Brother and Administrator of the Estate of
Nicholas Colbert, Deceased.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

/s/ Paul J. Cristallo
PAUL J. CRISTALLO (0061820)
Counsel for Plaintiff Daniel Colbert,
as Brother and Administrator of the Estate
of Nicholas Colbert, Deceased